## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

DYNAMIC MOTION RIDES GMBH,
an Austrian company, and DYNAMIC
MOTION GROUP GMBH, an
Austrian company,

       Case No. 6:21-cv-752-RBD-LHP

       Plaintiffs,

vs.

UNIVERSAL CITY DEVELOPMENT
PARTNERS LTD, a limited
partnership, UNIVERSAL CITY
STUDIOS LLC, a limited liability
company, UNIVERSAL STUDIOS,
LLC, a limited liability company, and
PETERSEN INCORPORATED, a
Utah corporation,

       Defendants.

_____/

## UNIVERSAL DEFENDANTS' MOTION TO EXCLUDE EXPERT REPORTS OF DR. HANK FISHKIND, AND INCORPORATED MEMORANDUM OF LAW

     Defendants, UNIVERSAL CITY DEVELOPMENT PARTNERS, LTD. ("UCDP"), UNIVERSAL CITY STUDIOS LLC ("UCS"), and UNIVERSAL STUDIOS, LLC ("US") (collectively, "Universal"), by and through their undersigned counsel, pursuant to Fed. R. Evid. 702, hereby move to exclude (a) the March 17, 2022 Expert Report (the "Report") (Exhibit "A" hereto), and (b) the May 18, 2022 Rebuttal Report (the "Rebuttal") (Exhibit "B" hereto) of

Plaintiffs, DYNAMIC MOTION RIDES GMBH ("DMR") and DYNAMIC MOTION GROUP GMBH's ("DMG") (collectively, "Plaintiffs"), damages expert, Dr. Hank Fishkind.

## SUMMARY OF ARGUMENT

First, the Court should exclude Dr. Fishkind's reports in their entirety because they are devoid of any analysis or discussion of what the allegedly infringed patents cover, what the benefits said patents have over the prior art, or what any identifiable trade secrets are. Second, the Court should exclude Dr. Fishkind's reasonable royalty opinions because his methodologies for calculating the royalty rate, gross revenue, license fee, and apportionment are arbitrary, unreliable, and contrary to facts and data. Third, the Court should exclude Dr. Fishkind's lost profits opinions because DMR is not the patent owner or an exclusive licensee, DMG is not an operating entity that would make profits from a sale, and Dr. Fishkind's approach to determining lost profits is fatally flawed. Fourth, the Court should exclude Dr. Fishkind's breach of contract damages because his methodologies for determining unpaid invoices and interest are unreliable and not helpful to the trier of fact.

## ARGUMENT

### A.  Standard of Review.

Under Fed. R. Evid. 702 and the principles set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), district courts must act as

"gatekeepers" and may "admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). To fulfill its gatekeeping function, a district court must conduct a rigorous three-part inquiry to determine (1) whether the expert is qualified to testify competently as to the matters to be addressed; (2) whether the expert's methodology is sufficiently reliable; and (3) whether the testimony will assist the trier of fact. *Id.* at 1291-92. The party offering the expert bears the burden of satisfying all three elements by a preponderance of the evidence. *Id.* at 1292.

District courts are given "wide latitude" in determining the reliability of an expert's methodology. *Doe v. Rollins Coll.*, Case No. 6:18-cv-1069-Orl-37LHP, 2020 WL 8408417, at *2 (M.D. Fla. Jan. 7, 2020). The Supreme Court has set forth "a non-exhaustive list of relevant factors to consider: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert*, 509 U.S. at 593-94).

**B.** **Dr. Fishkind's Entire Report and Rebuttal Should Be Excluded Because They Fail to Provide any Analysis of the Patents-in-Suit or the Alleged Trade Secrets at Issue.**

Dr. Fishkind testified that it is his understanding that Plaintiffs "are alleging infringement in the intellectual property, which included their

patented and non-patented intellectual property." Tr. 40:18-23.[1]  According to the Report, "[t]he IP is described in detail in the Third Amended Complaint in paragraphs 21-23.   In summary, the IP includes but is not limited to: (a) patents as referred to in the Intellectual Property Rights provision of the MPA, and (b) Preexisting Vendor Technology comprised of know-how, software, methods, and technology both patented and unpatented."  Rep. at 6, ¶28.  The Report provides no analysis of what the patents cover or what the alleged invention is.  Dr. Fishkind admitted as much during his deposition and even admitted that he did not recall ever reviewing the patents themselves.  Tr. 35:14-36:15.   Dr. Fishkind also admitted that he was not aware of any "identifiable" trade secrets of DMR.  *See* Tr. 85-86.

Instead, for the descriptions of the patents-in-suit and alleged trade secrets at issue, Dr. Fishkind relies entirely on the allegations of the Third Amended Complaint ("TAC") (Doc. 63).  Tr. 35:14-36:15.  In the Rebuttal, Dr. Fishkind confirmed his sole reliance on these allegations.  Rebut. at 2-3, ¶¶ 8, 12 (stating the IP was clearly described in paragraphs 28 and 29 of the Report). Dr. Fishkind's reliance on the TAC is misplaced, as no detailed description of the IP is contained therein; Plaintiffs simply refer to "know how, software, methods and technology (both patented elements owned by [DMG] and used

---

[1] Citations to the transcript of the May 5, 2022 deposition of Dr. Fishkind (Exhibit "C" hereto) are denoted "Tr. Page:Line."

by its affiliate [DMR] by agreement, as well as unpatented." TAC at 10, ¶21.

In addition, Dr. Fishkind provides no discussion of how the "Race Through New York Starring Jimmy Fallon™" (the "Attraction") actually uses the patented technology, which he admitted during his deposition. Tr. 38:16-21. Likewise, Dr. Fishkind provides no analysis or explanation of the benefit of the patents over the prior art technology or the demand for the alleged invention. Where an expert fails to explain how the advantages of the patented invention relate to the proposed royalty rate, his testimony is inadmissible. *See Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1349-50 (Fed. Cir. 2018) (stating the court must "carefully tie proof of damages to the claimed inventions footprint in the market place," which required the expert to explain the extent to which the advantages of the patented technology "factored into the value of the lawn mower and her 5% royalty rate").

In the Rebuttal, Dr. Fishkind argues that how the "IP was embodied in the Attraction" is discussed in the Report at paragraph 50 and that "the benefits and advantages of the patented inventions over the prior art" are discussed in the Report at paragraphs 66 and 67. Rebut. at 3, ¶¶ 9, 11. The cited paragraphs contain no such discussions. Paragraph 50 states only that "[u]nder the MPA the Plaintiffs expected to design and construct the Attraction and to provide a perpetual license to Universal for the rights to use the IP that

needed to be incorporated into the Attraction." Rep. at 11. Similarly, paragraph 66 provides only a cursory statement with no connection between what is covered by the patents or unspecified trade secrets and how the Attraction works. Although the introductory language in paragraph 66 refers to the "advantages of the patent property over the old modes or devices," paragraph 66 does not identify any such advantages. Paragraph 66 never quotes the claim language or identifies the difference between the claimed invention and the prior art. For example, paragraph 66(D) talks about the advantages of a moving "platform system." But it is undisputed that moving platform systems were present in the prior art, and Dr. Fishkind does not attempt to differentiate the claimed invention from that prior art. Therefore, this paragraph (and his Report in its entirety) wholly fails to identify the advantages, if any, of the claimed invention over the prior art.

Similarly, paragraph 67(A) of the Report says nothing more than that:

"The IP is the basis of the technology embodied in the Attraction. The flying theatre is the heart of the Attraction."

Thus, the portions of his Report to which Dr. Fishkind points to illustrate how he identified with specificity the advantages of the claimed inventions, illustrates quite the opposite. Dr. Fishkind did not make even the most minimal effort to identify the nature and advantages of the claims of the Asserted Patents and as a result, any opinions that he expresses regarding the

appropriate reasonable royalty with respect to such patent claims lacks foundation and must be stricken.

**C.   Dr. Fishkind's Reasonable Royalty Opinions Should Be Excluded.**

    **1.   Dr. Fishkind's methodology for calculating the royalty rate is unreliable.**

In the Report, Dr. Fishkind purports to utilize the hypothetical negotiation approach for determining a reasonable royalty using the fifteen factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  Rep. at 12.  An expert must go beyond "reciting each factor and making a conclusory remark about its impact on the damages calculation." *Whitserv, LLC v. Comp. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012).  Where an expert fails to tie his royalty rate to the facts of the case, the expert's testimony is inadmissible.  *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) ("Because Weinstein did not 'carefully tie proof of damages to the claimed invention's footprint in the market place,' his testimony on the royalty case under this approach was inadmissible and should have been excluded." (internal citations omitted)); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (holding "25 percent rule of thumb" for determining royalty rate was inadmissible "because it fails to tie a reasonable royalty base to the facts of the case").  Dr. Fishkind's opinion is devoid of any substantive analysis tying the *Georgia-Pacific* factors to his

proposed royalty rate or the facts of this case and, instead, amounts to little more than a recitation of the factors. From that cursory recitation, Dr. Fishkind then plucked an arbitrary royalty rate of 14%. "It is not enough for an expert to simply assert that a particular royalty rate is reasonable in light of the evidence without tying the proposed rate to that evidence." *Exmark Mfg. Co.*, 879 F.3d at 1349 (excluding expert's testimony where expert "merely addressed the *Georgia-Pacific* factors in light of the facts and then plucked the 5% royalty rate out of nowhere").

Furthermore, Dr. Fishkind failed to conduct a separate analysis for trade secrets and patents, instead lumping them together as "the IP." Rep. at 6, ¶29 (stating "the IP consists of both patented and non-patented intellectual property"); Tr. 41:13-24 (stating the patents and trade secrets "are enmeshed in this case"). Dr. Fishkind's methodology is unreliable because it is not a peer-reviewed method, as the *Georgia-Pacific* factor analysis applies to patent infringement, not misuse of trade secrets. Indeed, Dr. Fishkind admitted during his deposition that he has never seen the analysis used in a context other than patent infringement. *See* Tr. 42:22-25.

When questioned about his application of the *Georgia-Pacific* factors to the misuse of trade secrets, Dr. Fishkind confirmed the speculative nature of his methodology, testifying that, "since we have two pieces enmeshed and it would be extremely difficult, if not impossible, for me to separate the pieces

8

and examine the damages associated with each," he thought that utilizing the *Georgia-Pacific* factors for all IP was appropriate. Tr. 42:6-17. Dr. Fishkind is unable to even identify <u>any</u> particular trade secret (Tr. 86:19-20), yet he purports to value the unknown trade secrets together with "enmeshed" patented technology that he cannot describe beyond what is alleged in the TAC. While Dr. Fishkind acknowledges that a "patent owner is only to be compensated for the infringement, not for factors extraneous to use of the patented invention," he admits that he made no attempt to break out how much is owed for use of the patents as opposed to the unknown trade secrets in his reasonable royalty analysis. Rep. at 7, ¶33; Tr. 102.

Dr. Fishkind also makes an entirely conclusory assumption that "[t]he methodology to calculate damages from an infringement on trade secrets is similar to the one for patent infringement." Rep. at 7, ¶31. In the Rebuttal, Dr. Fishkind argues he "precisely addressed" the "differences in the reasonable royalty approach between the patented and non-patented IP" in paragraphs 29-30 of the Report. Rebut. at 9, ¶9. The Report contains no such analysis. Dr. Fishkind then reiterates his unsupported conclusion that "the methodology to calculate damages from an infringement on trade secrets is like the one for patent infringement." Rebut. at 9, ¶27. Dr. Fishkind's unsupported conclusion amounts to nothing more than a classic example of *ipse dixit*, rendering his opinions inadmissible. *See Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*,

9

254 F. Supp. 2d 1239, 1244 (M.D. Fla. 2003).

### 2. Dr. Fishkind's determination of a 14% royalty rate is arbitrary.

In establishing a reasonable royalty rate, the "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009); *see also LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) ("alleging a loose or vague comparability between different technologies or licenses does not suffice"); *Atlas IP, LLC v. Medtronic, Inc.*, No. 13-CIV-23309, 2014 WL 5741870, at *6 (S.D. Fla. Oct. 6, 2014) (excluding royalty rate where expert failed to demonstrate license data upon which he relied was sufficiently comparable). In his determination of the royalty rate, Dr. Fishkind concludes that "Plaintiffs would have agreed to a license for their IP at a running royalty rate of 14% of the sales generated by the Attraction," stating that 14% is Plaintiffs' "established internal rate."  Rep. at 18, ¶H.  Dr. Fishkind further concludes that "Universal would have been willing to agree to a 14% royalty rate calculated on the gross sale generated by the Attraction."  Rep. at 19, ¶L.

Dr. Fishkind provided no factual basis or analysis in opining that Universal would agree in a hypothetical negotiation to a running (*i.e.*, annual) license fee based on gross revenue, nor would Plaintiffs have asked for such a

royalty.  *See* Tr. 57-58, 97-98.  Quite to the contrary, Dr. Fishkind admitted that "Plaintiffs do not sell or license their IP separately from their contracts to construct custom-made attractions like the Attraction at issue in this case." Rep. at 12, ¶58.A; Rep. at 8, ¶38; Tr. 58:1-23, 98.  And when he was presented with evidence that Universal has never agreed to a separate license with a ride vendor for the construction of an attraction—the license is always provided in the contract and the contract price includes the value of the license—Dr. Fishkind conceded in his Rebuttal that "[t]he fact that IP would be included as part of the contract with a ride vendor, like the Plaintiffs, is not surprising." Rebut. at 6, ¶29.

Nevertheless, the Rebuttal maintains that Universal would have agreed to a 14% royalty rate.  But Dr. Fishkind changed his opinion from a running royalty of approximately $2 million per year to a "one-time, flat royalty fee of $6.1 million."  Rebut. at 10, ¶32.  Based on "annual expected royalty revenue" of $2.1 million, Dr. Fishkind now opines that "[a] one-time payment of $6.1 million would be agreeable to both parties based on a five-year time horizon during the exclusivity period and using the discount rate of 22.3% reflecting the inherent uncertainties."  *Id.*  The referenced "exclusivity period" was three years after the Attraction opened to the general public, pursuant to the Exclusivity Rider in the Work Authorization.  Doc. 63-2 (at p. 3 of 11).  The Rebuttal makes loose reference to using "GP framework" but it contains no

11

analysis or factual basis whatsoever in support of the notion that Universal would have agreed to pay a royalty based on five years of revenue attributable to the Attraction.  It is a construct untethered to any reality.

Further, Dr. Fishkind primarily relies upon two license fees for his 14% royalty rate: (1) a 14% license fee, which Dr. Fishkind states is what DMR "pays" to its corporate parent DMG for use of DMG's patents (what Dr. Fishkind refers to as their "established internal rate"); and (2) a 7% license fee, which Dr. Fishkind states was a one-time fee based on the "gross contract value" for another attraction with a third party.  Rep. at 12, ¶58B.; 17, ¶¶72B. & 72C.; 18, ¶72H.

However, with respect to the 14% license fee that Dr. Fishkind relied upon, he admitted that (i) there is no written contract between DMG and DMR, (ii) the fee would be a one-time payment based on the contract price for an attraction (not a running royalty based on revenue), and (iii) there is no evidence that the 14% fee has ever been paid by DMR to DMG.  Tr. 91-93. Further, Dr. Fishkind acknowledged that this supposed arrangement between DMG and DMR cannot be considered "arms-length."  Tr. 101.  It therefore cannot be considered a "comparable" license.  Similarly, the 7% license fee that Dr. Fishkind relied upon was actually invoiced by DMG to another DMG affiliate—that is, another intercompany transfer rather than an arms-length agreement.  Tr. 96.  Dr. Fishkind admitted that he has not seen any evidence

12

that the owner of that attraction paid any license fee to DMG.  Tr. 97.

Not surprisingly, Dr. Fishkind failed to perform any analysis explaining how those alleged—and admittedly non-arms-length—licenses compare to the hypothetical license here.  As such, Dr. Fishkind's reliance on those license fees is arbitrary and renders his methodology wholly unreliable.  *See Arendi S.A.R.L. v. LG Elecs., Inc.*, No. 12-1595, slip op. at 8 (D. Del. Mar. 31, 2022); *Coleman Co. v. Team Worldwide Corp.*, No. 20-351, slip op. at 5-6 (E.D. Va. Jan. 31, 2022); *Chico's Fas, Inc. v. Clair*, No. 2:13-cv-729-FtM-38DN, 2015 WL 3496003, at *4 (M.D. Fla. June 3, 2015).

### 3.   Dr. Fishkind's 33% apportionment is speculative and unsupported.

Dr. Fishkind's methodology is also unreliable because he failed to apportion the alleged damages to the patented features of the Attraction.  "The law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product."  *VirnetX, Inc.*, 767 F.3d at 1329.  Thus, for an expert damages opinion to be admissible, the opinion "must separate the value of the allegedly infringing features from the value of all other features."  *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).

In the Report, Dr. Fishkind attributes 33% of the gross revenue allegedly

generated by the Attraction to the IP (which, as noted, improperly includes both patented and non-patented elements). Rep. at 22, ¶81. In making this apportionment, Dr. Fishkind makes the unsupported assumption that the gross revenue from the Attraction encompasses three components: "(a) the concept from Mr. Fallon and its film component; (b) Universal's goodwill in attracting visitors to the park; and (c) the IP." Rep. at 19, ¶73. These assumptions are mere conjectures and speculation, as Dr. Fishkind admitted he made no attempt to analyze whether the patented invention drove demand and further admitted that he does not know what drives people to the Attraction. Tr. 107:20-108:12 ("I would think they are interested in New York and Jimmy Fallon. But do I know? No, I haven't done a detail study of what would drive them to be in this ride compared to another ride ….").

Dr. Fishkind also testified he did not know the extent to which consumer demand is driven by the motion-based platform in the Attraction, stating "I don't think that can be extracted to a reasonable degree of certainty. I think people think about the rides as an entire experience." Tr. 108:13-21. Given that Dr. Fishkind admittedly did not perform any analysis—and, indeed, does not believe it would be possible to do so—his assumption of the components of the gross revenue generated by the Attraction is nothing but guesswork, and the Court should therefore exclude his opinions. *See Contour IP Holding, LLC v. GoPro, Inc.*, Case No. 3:17-cv-04738-WHO, 2021 WL 75666, at *10 (N.D. Cal.

14

Jan. 8, 2021) (granting motion to strike where "there is no underlying analysis or basis for [the apportionment] figure, as the law requires"); *Atlas IP, LLC*, 2014 WL 5741870, at *4 (evidence supporting apportionment "must be reliable and tangible, not conjectural or speculative").

Dr. Fishkind compounds the fallacy of his methodology by making another wholly unsupported assumption that, because "[i]t is not possible to determine the relative contributions of each of these components to a reasonable degree of economic certainty," he "will allocate 1/3 of the value to each of the components." Rep. at 19, ¶73; Tr. 136-37. Once again, Dr. Fishkind provides no basis for why the IP was worth 33% or how he calculated the apportionment. Dr. Fishkind's methodology appears to be that a pro rata allocation should be applied because he does not have support to calculate an actual apportionment. Dr. Fishkind's guesswork renders his opinions inadmissible. *See VirnetX, Inc.*, 767 F.3d at 1328 (holding opinion was inadmissible where expert "did not even try to link demand for the accused device to the patented features, and failed to apportion value between the patented features and the vast number of non-patented features contained in the accused products").

In addition, the apportionment is not attributed to just the patented features of the invention; rather, the 33% is attributed to all of "the IP." Thus, Dr. Fishkind did not apportion the royalty rate to the "smallest saleable unit"

for the patented invention, nor did he apply an entire market value rule analysis.  Whether viewed as "valuable, important, or even essential," the patented component must be separated, which Dr. Fishkind failed to do.  *Id.* at 1327-28 (excluding opinion of expert who "made no attempt to separate software from hardware, much less to separate the FaceTime software from other valuable software components").

Finally, to the extent Dr. Fishkind contends that it was too difficult to separate out the patented features, his contention is to no avail.  Courts have rejected the excuse that "practical and economic necessity compelled [the patentee] to base its royalty on the price of an entire [device]." *LaserDynamics, Inc.*, 694 F.3d at 69; *see also Atlas IP, LLC*, 2014 WL 5741870, at *5 (rejecting argument that because defendants did not produce documents from which expert could determine alternate apportionment, expert "had no choice but to conduct that analysis himself based on the available evidence, as the patentee bears the burden of giving "evidence tending to separate or apportion the defendant's profits' in its damages calculation").

## D.  Dr. Fishkind's Lost Profits Opinions Should Be Excluded.

In the Report, Dr. Fishkind purports to calculate the value of the IP measured by lost profits as an alternative measure of IP-related damages. Rep. at 11.  Dr. Fishkind states that "a conservative estimate for the Plaintiffs' lost profits from the infringement can be derived as the sum of: (a) the unpaid

invoices plus interest and (b) the profits the Plaintiffs would have earned to construct the Attraction which was misappropriated by Defendant Petersen." Rep. at 8, ¶39.

As an initial matter, DMR is not entitled to any lost profits damages because it is not the patent owner or an exclusive licensee,[2] and ¶23(L)(1) of the subject MPA expressly excludes lost profits. Doc. 63-1. For its part, DMG is not an operating entity so it has no lost profits.[3] Even if DMR or DMG were permitted to advance a claim for lost profits, moreover, Dr. Fishkind fails to provide any basis to support his methodology to determine a "conservative estimate for the Plaintiffs' lost profits." As such, Dr. Fishkind's methodology is unreliable and should be excluded. *See Lincoln Rock, LLC v. City of Tampa*, Case No: 8:15-cv-1374-T-30JSS, 2016 WL 6818959, at *8 (M.D. Fla. Nov. 18, 2016) (excluding Dr. Fishkind's expert testimony as unreliable, finding Dr. Fishkind's "conclusory observations" about plaintiff's profitability, together with his "flawed price-per-bed methodology, are too speculative to support Dr. Fishkind's damage estimate").

---

[2] *See Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303 (Fed. Cir. 2004) (finding that "Poly–Flex does not have exclusive rights. It is clearly identified in the license agreement as a non-exclusive licensee, and as such, it received only a "bare license" and has no entitlement under the patent statutes to itself collect lost profits damages for any losses it incurred due to infringement").

[3] *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1548 (Fed.Cir.1995) ("[I]f the patentee is not selling a product, by definition there can be no lost profits.").

An expert must "know 'facts which enable him to express a reasonably accurate conclusion instead of mere conjecture or speculation,' … and an expert's assurances that he has used generally scientific methodology are insufficient." *Lanard Toys Ltd. v. Toys "R" Us-Delaware, Inc.*, Case No. 3:15-cv-849-J-34PDB, 2019 WL 1304290, at *5 (M.D. Fla. Mar. 21, 2019). "Florida law also requires that assumptions used to support the conclusions of lost profit damages be reasonably certain, 'not mere best case scenario predictions.'" *Env't Biotech, Inc.*, 2008 WL 5070251, at *5; *see also Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, Case No. 2:18-cv-356-JES-MRM, 2022 WL 464210, at *5 (M.D. Fla. Feb. 15, 2022) (finding expert's opinions were unreliable where components of lost profit damages were not "calculated with reasonable certainty"); *BGW Design Ltd., Inc. v. Svc. Am. Corp.*, Case No.: 10-20730-Civ-COOKE/TURNOFF, 2011 WL 13172487, at *2 (S.D. Fla. Nov. 30, 2011) (excluding expert's lost profits opinion because report failed to support assumptions with facts or data and opinions were "based largely on speculation and conjecture").

In his calculation of lost profits, Dr. Fishkind relies on a number of arbitrary, unsupported assumptions that amount to nothing more than impermissible speculation and conjecture. Dr. Fishkind assumes a gross margin of 35% based solely on the fact that DMR "reports that it earns a gross margin of 35% of its work." Rep. at 11, ¶53. The Report does not cite any

documents to support Dr. Fishkind's assumed margin.  When pressed, the lone document that Dr. Fishkind identified claiming a 35% gross margin was DMR's September 8, 2020 invoice to Universal claiming "Lost Profit (35% Gross Margin)," issued nearly five years after termination of the MPA, which itself is devoid of support.  Tr. 70:25-19; Doc. 63-7 at p. 33 of 34.  In fact, Dr. Fishkind testified that he asked DMR for financials to support the 35% gross margin, but "they didn't offer any to me.  Whether they have them or not, they didn't produce them to me, so I don't have them."  Tr. 71:20-72:11.  Thus, the only documentation that DMR provided to Dr. Fishkind, despite his requests for backup, was the self-serving September 8, 2020 invoice.  *See* Tr. 72:9-20.

Dr. Fishkind did not perform any analysis of DMR's actual financials in particular or profitability in the ride manufacturing industry generally.  *See* Tr. 83:7-21. Instead, Dr. Fishkind simply accepted DMR's unsupported assertion that its gross margin was 35%.  "Adopting the unsupported beliefs of a business owner who has a financial motive to inflate recoverable damages is not a reliable methodology to project future lost profits."  *MasForce Eur., BVBA*, 2013 WL 12156469, at *6 (excluding expert opinion on lost profits, stating "it does not appear that [the expert] actually made any calculations, but instead simply accepted [plaintiff's] own statements regarding what it would have earned but for the incident").

19

Dr. Fishkind also relies on the unsupported assumption that DMR "could have constructed the Attraction for the same cost as Petersen billed Universal," again based solely on the unsupported and self-serving assertion by DMR. Rep. at 11, ¶53. Dr. Fishkind admitted during his deposition that he did not analyze what Petersen charged and simply accepted DMR's representation that it could have completed the Attraction for the same price, stating, "[e]ssentially, yes, that's the methodology. I mean, I did discuss it with the Plaintiff … but I wouldn't have the technical expertise to be able to really come to an opinion about that. I'm not a construction expert." Tr. 79:6-17.

Additionally, Dr. Fishkind did not undertake any analysis of the relative fee structures of DMR and Petersen, nor did Dr. Fishkind compare any other relevant factors such as labor and material costs and manufacturing and fabrication capacities. *See* Tr. 78:6-9. Moreover, Dr. Fishkind ignores the fact that the amounts billed by Petersen included costs incurred due to problems created by DMR's failure to perform under the MPA. Without examining the comparability of DMR's and Petersen's ability to construct the Attraction for the same cost, Dr. Fishkind's assumptions are the result of nothing more than speculation and guesswork. *See Lincoln Rock, LLC*, 2016 WL 6818959, at *8 (finding Dr. Fishkind's methodology unreliable where Dr. Fishkind relied on a "single arbitrary criterion" without demonstrating that facilities selected as comparables were actually comparable to plaintiff's facility).

Dr. Fishkind's unsupported assumptions are fatal to the reliability of his opinions of lost profits. *See McMahan Secs. Co. v. FB Foods, Inc.*, No. 8:04-cv-1791-T-24TGW, 2007 WL 704916, at *4 (M.D. Fla. Mar. 2, 2007) (excluding testimony on lost profits where assumptions upon which expert's opinions were based "are not grounded upon sufficient known facts and do not withstand scrutiny for reliability" and expert's future lost profits "are no more than hopeful estimates"); *R & R Int'l*, 2010 WL 3605234, at *14 (finding expert's analysis was not reliable, as expert admitted "he merely speculated with regard to fundamental aspects of his lost profits projections"); *see also HGR Constr., Inc. v. Hanover Ins. Co.*, Case No. 6:18-cv-1406-Orl-40LRH, 2020 WL 12604700, at *4 (M.D. Fla. July 13, 2020) (excluding expert testimony where methodology "appears to be nothing more than a guess" and expert's theory was "'subjective speculation masquerading as scientific knowledge'").

**E.    Dr. Fishkind's Opinions on Breach of Contract Damages Should Be Excluded.**

**1.    Dr. Fishkind's methodology for determining the amounts of unpaid invoices and interest is unreliable.**

Dr. Fishkind's methodology for determining unpaid invoices and interest is devoid of factual support and thus should be excluded. To "calculate" the amount of unpaid invoices, Dr. Fishkind merely took the invoice total stated in Exhibit G to the TAC and converted the amount from euros to dollars. Rep. at 10, ¶47; Doc. 63-7. Dr. Fishkind admitted he did not analyze each of the

invoices for purposes of his report, stating, he "looked at them to see if they were in general conformance to this summary, but … did not recalculate the summary." Tr. 62:6-11. Dr. Fishkind did not undertake any analysis of the invoice total or the invoiced amounts, claiming he took Exhibit G at face value because it was attached as an exhibit to the TAC. *See* Tr. 68:12-16.

However, an expert "may not, 'under the guise of giving expert testimony … [,] become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" *La Corce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*, CASE NO. 19-24016-CIV-ALTONGA/Goodman, 2022 WL 479877, at *4 (S.D. Fla. Feb. 16, 2022) (alterations in original). "Expert testimony which has no methodology and simply conveys information provided to the expert by an interested party is improper." *MasForce Eur., BVBA v. MEC3 Co.*, Case No. 8:11-CV-1814-T-24AEP, 2013 WL 12156469, at *5 (M.D. Fla. Dec. 4, 2013) (excluding expert testimony where expert "did nothing but review two documents, reformat their contents into a table, and convert the Euro amounts to dollars."). Because Dr. Fishkind's "methodology" for calculating unpaid invoices consists of nothing more than regurgitating Plaintiffs' calculations, his opinion is improper and should be excluded.

Dr. Fishkind's methodology for determining the amount of the unpaid invoices is further unreliable because Exhibit G (Doc. 63-7) contains numerous calculation errors, which Dr. Fishkind failed to identify or correct. "The Court

will not award any amount of damages based on an expert's opinion that employs a suspect methodology and relies on admittedly inaccurate data, especially where that opinion is not supported by any evidence in the record." *Env't Biotech, Inc. v. Sibbitt Enters., Inc.*, No. 2:03-cv-124-FTM-33SPC, 2008 WL 5070251, at *7 (M.D. Fla. Nov. 24, 2008) (finding expert's testimony unreliable where valuation was based on financial statements that contained admitted inaccuracies).   For example, there is a discrepancy between the amount listed on the summary table for invoice DMR-0023 and the amount actually stated in the invoice.   In addition, invoices DMR-001 and DMR-003 contain calculation errors and typos, which Dr. Fishkind failed to reconcile.

DMR also invoiced for work performed by its subcontractors that was paid by Universal after DMR failed to pay, resulting in the invoiced amounts stated in Exhibit G being overstated.   Dr. Fishkind made no effort to account for these payments.   During his deposition, Dr. Fishkind admitted he did not ask whether the invoices contained any markups for charges by subcontractors and did not ask whether Universal made any direct payments to subcontractors.   Tr. 63:2-64:7.   However, Dr. Fishkind acknowledged that "if there are invoices during this period that were paid by Universal, they shouldn't be included in" Plaintiffs' summary, and that if the invoices included payments that Universal had made to subcontractors, "of course that would be a credit against this amount."   Tr. 64:8-35:8.   Because Dr. Fishkind did not

23

make any effort to scrutinize the allegedly unpaid invoices, he did not notice that invoice 2015-0026 (Doc. 63-7 at p. 18 of 34) was marked "settled" based on Universal's direct payment to one of DMR's subcontractors, yet it was included in the summary of unpaid invoices that Dr. Fishkind accepted at face value.

Dr. Fishkind's calculation of interest is also based on unreliable methodology. In the Report, Dr. Fishkind states he calculated interest "at 6% as per the Third Amended Complaint." Rep. at 10, ¶48. Dr. Fishkind confirmed during his deposition that the 6% interest rate was based strictly on what was alleged in the TAC. Tr. 53:15-22. However, the MPA does not provide for a 6% interest rate to be applied to unpaid invoices, and the TAC does not identify any basis for this rate. Further, to the extent Dr. Fishkind is attempting to calculate pre-judgment interest, such calculation is not properly included in the principal amount of the damage claim.

### 2.   Dr. Fishkind's opinions are not helpful to the trier of fact.

Dr. Fishkind merely reiterates what the unpaid invoices themselves state with no analysis that would be helpful to the trier of fact in determining the amount of damages. When an expert "is merely parroting evidence provided to him," the expert opinion is improper, as such evidence should be introduced by a lay witness rather than an expert. *See Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, Case No. 8:11-cv-775-T-24-TBM, 2014 WL 12623025, at *5 (M.D. Fla. May 29, 2014) (excluding expert opinion where expert merely

reviewed amounts alleged by plaintiff and confirmed the accuracy of the amounts with the underlying invoices). The amounts of the invoices can be introduced through a lay witness, and, moreover, arguments regarding the amounts of the invoices can be made by the attorneys at trial. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004).

In addition, specialized knowledge is not required to total the amounts alleged to be due for unpaid invoices. Expert testimony that consists of a "simple arithmetic calculation is not beyond the understanding of the average lay person and therefore would not help the trier of fact." *LSQ Funding Grp., L.C. v. EDS Field Svcs.*, 879 F. Supp. 2d 1320, 1336 (M.D. Fla. 2012); *see also Bowe v. Pub. Storage*, Case No.: 1:14-cv-21559-UU, 2015 WL 11233065, at *4 (S.D. Fla. May 7, 2015) (finding expert's opinions did not require specialized expertise where "calculation involves three figures that are undisputed and were reached either by simple addition and or by viewing a limited set of [defendant's] documents").

**WHEREFORE**, the Universal Defendants respectfully request that the Court enter an Order (a) granting this Motion; (b) excluding the Report and Rebuttal Report of Dr. Fishkind; and (c) granting such other and further relief as the Court deems proper.

25

## **Local Rule 3.01(g) Certification**

The undersigned certifies that counsel for Defendants has conferred with counsel for Plaintiffs in a good faith effort to resolve this Motion, and the parties do not agree on the resolution of the Motion.  The conference occurred via telephone on May 31, 2022.

DATED this 1st day of June, 2022.

*/s/ Michael J. Beaudine*
**Michael J. Beaudine, Esq.**
Florida Bar No. 0772763
beaudine@lathamluna.com
**Christina Y. Taylor, Esq.**
Florida Bar No. 57616
ctaylor@lathamluna.com
**LATHAM, LUNA, EDEN & BEAUDINE, LLP**
201 South Orange Avenue, Suite 1400
Orlando, Florida 32801
Telephone:  (407) 481-5800
Facsimile:  (407) 481-5801

**Steven Lieberman, Esq.**
slieberman@rothwellfigg.com
**Jennifer B. Maisel, Esq.**
jmaisel@rothwellfigg.com
**ROTHWELL, FIGG, ERNST & MANBECK, PC**
607 14th Street N.W.; Suite 800
Washington, DC 20005
Telephone: (202) 783-6040
Facsimile:  (202) 783-6031

*Attorneys for Universal Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that June 1, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will serve an electronic copy on all counsel of record.

*/s/ Michael J. Beaudine*

**Michael J. Beaudine, Esq.**